IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JAMES D. SCHAEFFER**                                                    **PLAINTIFF**

**VS.**                                                    **CIVIL ACTION NO. 3:14cv00945-DPJ-FKB**

**WARREN COUNTY, MISSISSIPPI**
**AND THE WARREN COUNTY BOARD OF SUPERVISORS**         **DEFENDANTS**

**<u>MEMORANDUM BRIEF IN SUPPORT OF RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR
REMITTITUR OR FOR NEW TRIAL</u>**

**a. The evidence does not support a finding by the jury
that the Defendants retaliated against the Plaintiff.**

**(i) The Plaintiff failed to prove a causal link between the
protected activity and the employment action.**

Warren County's Renewed Motion for Judgment as a Matter of Law contends that the evidence presented by the Plaintiff (hereinafter "Schaeffer") is insufficient to support the jury's finding that Schaeffer's employment would not have been terminated in the absence of i.e., but for– activity by Schaeffer protected by the Fair Labor Standards Act (FLSA).  In determining this motion, the trial court must determine whether the evidence presented was sufficient to establish that Warren County retaliated against Schaeffer because Schaeffer participated in an activity protected by federal law.

> Indeed, there is precedent holding that after a full trial on the merits, a district court must look at whether the plaintiff had presented sufficient evidence to allow a jury to arrive at a verdict, i.e., whether the plaintiff has met his ultimate burden of proving discrimination or retaliation (depending on the statute at issue), rather than simply focusing on the Plaintiff's *prima facia* case. This circuit has phrased the question for the jury as "the ultimate question of whether a defendant took the adverse employment

1

>action against a plaintiff **because of ... protected status**." *Hagan v. Echostar Satellite, LLC*, 529 F. 3d 617, 624 (5th Cir. 2008). (emphasis added). See also *Palasota v. Haggar Clothing Co.*, 342 F. 3d 569, 574 (5th Cir. 2003); *Powell v. Rockwell International Corp.*, 788 F. 2d 279, 285 (5th Cir. 1986).

Therefore, we examine the record to determine if evidence presented was sufficient to support a jury finding that Schaeffer "met his ultimate burden of proving... retaliation." *Hagan*, 529 F. 3d at 624.

Schaeffer testified that he met with the head of his department, Buddy Poole (hereinafter "Poole"), in October, 2013. Schaeffer claims that statements made by Schaeffer during this meeting provoked Poole to ultimately recommend to the Defendants that Schaeffer be removed from the Warren County payroll. (TR 51, Line 17 -22; TR 53, Line 19 – TR 54, Line 2). (Exhibit P-4). Schaeffer reaches this conclusion because Poole became "upset" during the meeting. (TR 9, Line 17 – TR 11, Line 20). Among the subjects discussed at the meeting was a complaint by Schaeffer that a recent pay check failed to include $49.65, an amount characterized by Schaeffer as "overtime." (TR 9, Line 4 -6; TR 45, Line 6 – TR 46, Line 1).

Because Poole allegedly became "intimidated" during the meeting, Schaeffer claims that his overtime complaint was causally connected to the termination of his employment. (TR 51, Line 20 - 22; TR 53, Line 19-25). In fact, Poole's reaction to Schaeffer's statements during the meeting is the only evidence that Schaeffer presented to the jury to support the contention that Schaeffer's termination was based on discriminatory animus. Stated differently, if the October meeting had ended happily and amicably, Schaeffer would have no basis at all to argue that Poole's employment action was causally related to the October meeting. Clearly, the fact that Poole reacted negatively during the meeting is not sufficient, standing alone, to support the jury's

determination that Schaeffer's employment would not have been terminated "but for" his overtime complaint.

 Assuming, *arguendo*, that a supervisor's unhappiness in response to an employee's engagement in a protected activity could ever be sufficient to establish a causal link between the activity and a subsequent employment action, the evidence in this record fails to establish that Poole became upset or angry as a result of the overtime complaint.  Rather, the following testimony by Schaeffer clearly indicates that Poole also became angry with Schaeffer as a result of statements made by Schaeffer in the meeting totally unrelated to the overtime issue:

> Q. What was his reaction to your request?
> A. He – he was put out with it for some reason.  I don't know why.  He turned red in the face and – because I questioned him about the overtime that I was not receiving that I should have received.  I guess he was questioning my – his ability or his authority.  I don't know where – what he was questioning really.
> Q. How did the meeting end?
> A. Mr. Poole got very upset because not only did I talk to him about the overtime that I had been beat out of, but I go by the policies and procedures book that the county puts out.  And on page 54, top of the page, it says if an employee has any suggestions, grievances or complaints, that you go to your supervisor before it ever goes to the board of supervisors.
>
> So in this particular meeting I brought up again to Buddy, which I had brought it up to him more than one time within a two-year period of time and in front of Mr. Carson, I said, Buddy, it's getting kind of hard out there, you know, without any substitute pilots.  I said, How much longer can this go on?  I said, Mr. Brewer and I are working ourselves to death.
>
> **I said, Are you afraid to do down there to the – <u>I shouldn't have said that possibly</u>.  I said, Are you afraid to do down there to the board of supervisors and ask them if you could put on another pilot?  <u>And I think that triggered it right there when I said</u>, Are you afraid to do down to the board of supervisors and ask them if we could get some more help out here?  So that was one thing he turned all red in the face and**

> **bowed up on.**
>
> And then the other thing was, I said, Mr. Poole, would you look into this – this holiday pay thing? I said, I feel like reading in the policy and procedures book here and the way holiday pay is being handled that we're not getting our deserved share of it. (TR 9, Line 17 – TR 10, Line 24).
>
> <center>**********</center>
>
> The other thing – no, let's just leave – that's enough right there. **But that was – that was the <u>two things</u> that was talked about in the meeting that <u>Mr. Poole I think took offense to.</u>** (TR 11, Line 17-20).

On cross examination Schaeffer testified:

> I made a suggestion that he took it the wrong way I assume, **and I could tell by the redness in his face when I was talking with him about hiring some pilots... hiring another pilot to help us out out there, and also I talked to him about getting the hours straight on the holiday pay and stuff like that. He was intimidated. He actually – I could see it. He was angry.** (TR 50, Line 25 - TR 51, Line 7).

Assuming Poole was motivated to retaliate against Schaeffer as a result of statements made by Schaeffer in the October meeting, Schaeffer has not established that Poole retaliated as a result of Schaeffer's FLSA complaint as opposed to his other insubordinate, and unprotected, comments. According to Schaeffer's testimony, Poole denied Schaeffer's request for an overtime payment. (TR 9, Line 4 -6). Poole was certainly privileged to deny the request since Schaeffer is admittedly not entitled to overtime under the FLSA. However, there is no evidence that Poole made any other comment or statement at the meeting in relation to the overtime request from which the jury could deduce or infer that Poole was motivated to retaliate as a result of the request.

In the course of this meeting, Schaeffer admits that he accused Poole of being "afraid" to address certain issues with the Board of Supervisors. Schaeffer admits that he should not have

<center>4</center>

queried his supervisor about his supervisor's alleged fear of the board of supervisors and admits that this comment "triggered" Poole's anger and animosity toward Schaeffer. (TR 10, Line 12-19). Although Schaeffer does contend that his statements at this meeting precipitated the loss of his job, he nevertheless confirmed his admission in his deposition that he was unable to isolate and identify the overtime complaint as the "but for" cause of the adverse employment action. (TR 55, Line 2-10). Specifically, when asked "if you had not ... confronted him (Poole) about this overtime ... would (you) still be working at the county," Schaeffer admitted that he was "not sure." (TR 55, Line 1-8).

Like Schaeffer, the jury also could not conceivably conclude from the evidence presented that the overtime complaint was the "but for" cause of Schaeffer's termination simply because Poole became "red in the face... because I questioned him about the overtime." (TR 9, Line 19-20). Other than a testimony about a "red face," there is no evidence of any conduct, words or actions by Poole from which a jury could infer that Poole entered upon a course to retaliate against Schaeffer as a result of a $49.65 overtime complaint. Specifically, there is no evidence that Poole communicated again with Schaeffer about his overtime issue or that Poole communicated with anyone else, either negatively or positively, about the overtime issue or about Schaeffer in general. In fact, there is no evidence that Poole had any further dealings with or regarding Schaeffer after the October meeting except in response to Schaeffer's leave request and his failure to appear for work on December 1 and 2, 2013.

It is hard to imagine a weaker retaliation case on the essential requirement of causation. Plainly, there is no evidence in this record to support a jury conclusion that Poole took an adverse employment action against Schaeffer because Schaeffer engaged in a protected activity. Due to

the absence of any evidence of a causal link between Schaeffer's overtime complaint and the termination of his employment, Warren County is entitled to judgment as a matter of law.

### (ii) The Plaintiff failed to prove that the stated reason for the employment action was pretextual.

Almost all of the evidence presented by Schaeffer at trial related to convincing the jury that Schaeffer did not violate county policy when he failed to report to work on December 1 and December 2, 2013.  Since Schaeffer claims that he did not violate county policy, he asked the jury to infer that the real reason for his termination was his overtime complaint.[1]  However, the jury was properly instructed that "a plaintiff's assertion of innocence relating to the stated reason for termination does not create a factual issue as to pretext."  Rather, the jury must conclude by a preponderance of the evidence that Poole fabricated the stated reason for the employment action as a pretext for discrimination.

> That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." (citations omitted).  As the district court noted, "[t]he issue at the pretext stage is whether [the employer's] reason, ***even if incorrect***, was the real reason for [the plaintiff's] termination." *Goudeau v. National Oilwell Varco, LP*, 793 F. 3d 470, 476 (5th Cir. 2015). (emphasis added).

It is uncontradicted in the record that Poole denied Schaeffer's request for leave on December 1 and 2, 2013 because Poole believed that there were no substitute pilots available.[2]  It

---

[1] Warren County believes that it is unnecessary for the court to address the issue of pretext since Schaeffer has clearly failed to meet his "ultimate burden of proving discrimination or retaliation." *Id.* However, out of an abundance of caution, Warren County will address Schaeffer's pretext argument.

[2] Although Schaeffer apparently intended for the jury to infer that the denial of his leave requests was somehow evidence that he was treated differently after the alleged "overtime"

is also undisputed that Schaeffer nevertheless failed to appear for work on December 1 and 2, 2013 and that he failed to call his supervisor to explain his absence. It is uncontradicted that the failure to appear for work on two consecutive days without calling the supervisor is deemed a resignation of employment by county policy (Ex. D-1, p. 44).

In response, however, Schaeffer alleges that David Brewer (hereinafter "Brewer"), another pilot employed by Warren County, agreed to work Schaeffer's shift on December 1. Schaeffer also alleges that his foreman, Earl Carson (hereinafter "Carson"), stated that a new pilot, Matthew Sanderson, was to be hired and could substitute for Schaeffer on December 2. (TR 25, Line 9-17). Schaeffer apparently contends that Poole's stated reason for his employment action against Schaeffer was not worthy of credence, and therefore pretextual, because of these statements allegedly made by Brewer and Carson.

Schaeffer called Brewer and Sanderson to testify in his behalf. However, Brewer plainly and unequivocally testified that he refused to work Schaeffer's shift. Brewer stated that "I had told him (Schaeffer) that I was not going to work for him and that he needed to find somebody else to do it." (TR 107, Line 13-23). Carson, also called to testify by Schaeffer, corroborated Brewer's testimony. (TR 118, Lines 3 – TR 119, Line 7). Furthermore, Sanderson confirmed that he was never employed by the county to pilot the ferry. (TR 94, Line 16 – TR 96, Line 25).

> Our job as a reviewing court conducting a pretext analysis is not to
> engage in second-guessing of an employer's business decisions

---

complaint, the inference was not supported by the evidence. Even though previous requests for leave had been granted, both Poole and Carson testified that they could not grant this particular leave request because there was no licensed substitute pilot available. (TR 116, Line 3-25; TR 134, Line 13 – TR 135, Line 11). Schaeffer never disputed that his leave was denied for this reason as evidenced by his efforts to find a substitute immediately after his leave was denied. (TR 20, Line 5-13).

Case 3:14-cv-00945-DPJ-FKB   Document 62   Filed 02/10/17   Page 8 of 16

> (citations omitted).  Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones. (citations omitted).  Therefore, LeMaire must do more than simply argue that LaDOTD made an incorrect decision.  Here, LaDOTD was presented with conflicting stories regarding whether LeMaire was sleeping on the job on July 19.  Endres asserted LeMaire was sleeping, and four of LeMaire's co-employees claim LeMaire told them he was sleeping.  Despite LeMaire's denial of these actions, we will not second-guess LaDOTD's decision to disbelieve LeMaire's explanation, given the conflicting factual accounts. Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext. (citations omitted).
> *LeMaire v. Louisiana Department of Transportation and Development*, 480 F. 3d 383, 391 (5th Cir. 2007).

Likewise, here there are "conflicting stories" relating to whether or not Schaeffer was permitted to take leave on December 1 and 2.  However, despite the conflicting versions, in order to demonstrate pretext, Schaeffer was nevertheless required to prove that ***Poole*** did not believe in good faith that a violation occurred.  On this essential issue, there is no evidence in the record that Poole was even made aware of the "conflicting stories" before Schaeffer was terminated.  More specifically, there is no evidence that Poole was aware of the alleged understanding between Schaeffer and his foreman, Carson, that other pilots would substitute for Schaeffer on December 1 and 2.  There is no evidence that Poole was aware of any alleged agreement made by Carson and Schaeffer in contradiction of Poole's denial of the leave request. To the contrary, Schaeffer testified that he never communicated with Poole that he planned to take leave on December 1 and 2 because he believed other pilots had arranged to work those shifts. (TR 60, Line 25 – TR 61, Line 5).  Further to the contrary, Poole testified without contradiction that Schaeffer's leave request was denied solely because Brewer would ***not work*** for Schaeffer.  (TR 134, Line 22 – TR 136, Line 3). It is also undisputed that Poole's denial of Schaeffer's leave request was never rescinded or revoked.  (TR 61, Line 24 – TR 62, Line 6).  Furthermore, when

8

Poole confronted Schaeffer about his policy violation on December 3, 2013, Carson was present. Schaeffer admits that Carson did not advise Poole at that time or at any other time that Schaeffer had been told that his shift would be covered by other pilots. (TR 63, Line 3 – TR 64, Line 10).

> To the extent that Waggoner's summary judgment evidence relates to his innocence of the sexual harassment charge, it is irrelevant. He must, instead, produce evidence demonstrating that Hamilton or Phillips did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him on the *basis of his age*. Indeed, he alleges that Hamilton and Phillips not only knew the allegations were false, but that in fact they fabricated them for the purpose of discriminating against Waggoner because of his age. He fails, however, to produce any evidence that supports his conclusory allegations. *Waggoner v. City of Garland, Texas,* 987 F. 2d 1160, 1166 (5th Cir. 1993) (emphasis by the court).

Likewise, here there is no evidence upon which the jury could conclude that Poole did not believe in good faith that Schaeffer was guilty of a policy violation. There is no basis in the record upon which the jury could find that Schaeffer's two day unexcused absence was not Poole's real reason for the employment action against Schaeffer.

### (iii) Plaintiff failed to offer any evidence that Poole exerted leverage or influence on the Board of Supervisors.

It is undisputed that Poole submitted to the Board of Supervisors a written recommendation that Schaeffer be removed from the county payroll for failing to report to work on December 1 and 2, 2013. (Ex. D-4). It is also undisputed that, under county policy, the decision to terminate Schaeffer's employment was made by the Board of Supervisors. (Ex. D-, p. 52). Schaeffer does not contend that the members of the Board of Supervisors retaliated against him as a result of his overtime complaint. In fact, in his testimony, Schaeffer admits that he did not tell any member of the board about his overtime complaint and did not ask the board

9

to pay him $49.65 in "overtime" pay to which he claimed to be entitled. (TR 73, Line 8-10; 15-17). Furthermore, Schaeffer did not tell the members of the board that Poole was retaliating against him because of an overtime complaint. (TR 73, Line 11-14).

Since the Board of Supervisors made the ultimate employment decision regarding Schaeffer and since there is no allegation that members of the board acted with discriminatory animus, Schaeffer alleges that the board was a "cat's paw" for Poole's intentional retaliation.

> Roberson also asserts that a "cat's paw" analysis should be applied to Helms's reduction-in-force decisions because she was influenced by others who harbored discriminatory animus. "If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary co-workers, it is proper to impute their discriminatory attitudes to the formal decisionmaker." (citations omitted) To invoke the cat's paw analysis, Roberson must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker "possessed leverage, or exerted influence, over the titular decisionmaker." (citations omitted). Roberson argues that the actions of Glynda Dickerson, Roberson's supervisor, should be imputed to Helms under the cat's paw analysis. In order to invoke the analysis, Dickerson must have demonstrated discriminatory animus such that it would be necessary to impute illicit motives from Dickerson to Helms."
> *Roberson v. Alltell Information Services*, 373 F 3d. 647, 653 (5th Cir. 2004).

As discussed in the previous sections, there is no evidence to establish that Poole "demonstrated discriminatory animus such that it would be necessary to impute illicit motives" from Poole to the Board of Supervisors. *Id.* Therefore, we believe that the court should not reach an analysis of the applicability of liability under a cat's paw theory. Nevertheless, even if there was any evidence that Poole was afflicted with a discriminatory animus toward Schaeffer, there is no evidence in the record that Poole "possessed leverage, or exerted influence" over the Board of Supervisors. *Id.*

> Under the cat's paw theory, a subordinate employee's discriminatory remarks regarding a co-worker can be attributed to the workplace superior, ultimately the one in charge of making employment decisions, when it is shown that the subordinate influenced the superior's decision or thought process. *Haire v. Board of Supervisors of Louisiana State University*, 719 F. 3d 356, note 11 (5th Cir. 2013)
>
> **********
>
> Generally, "[i]f the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said... that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." (citations omitted). However, a coworker who is aware of the plaintiff's protected activity may under certain circumstances supply the causation requirement. This may be so even when the coworker is not himself the decisionmaker. (citations omitted). One example is when a coworker makes a recommendation to terminate and the decisionmaker is merely a rubber stamp on that coworker's decision. (citations omitted). Another example is when the coworker "had influence or leverage over the official decionmaker." (citations omitted). *Gorman v. Verizon Wireless Texas, LLC*, 753 F. 3d 165, 171 (5th Cir. 2014). See also *Equal Employment Opportunity Commission v. DynMcDermott Petroleum Operations Company*, 537 Fed. Appx. 437, 443-444 (5th Cir. 2013), *Valderaz v. Lubbock County Hospital District*, 611 Fed. Appx. 816, 822 (5th Cir. 2015); *Holiday v. Commonwealth Brands, Inc*. 483 Fed. Appx. 917, 921-922 (5th Cir. 2012).[3]

Although Schaeffer ostensibly contended that the Board of Supervisors was the cat's paw for Poole's discriminatory animus, he presented no evidence in support of this theory. In fact, Schaeffer presented no evidence whatsoever relating to or reflecting upon the relationship between Poole and the Board of Supervisors. Although it is admitted that Poole recommended that Schaeffer be removed from the county payroll, it is clear from the above cases that a mere

---

[3] One panel of the 5th Circuit has held that the plaintiff "must present at least some evidence that the decision maker was aware of the protected activity." *Turner v. Jacobs Engineering Group, Inc*., 470 Fed. Appx. 250, 253 (5th Cir. 2012).

suggestion is not sufficient. Rather, Schaeffer was required to demonstrate by preponderance of the evidence that the board was "merely a rubber stamp" of Poole's recommendation or that Poole "had influence or leverage over" the board. *Gorman*, 753 F. 3d at 171.

Schaeffer did not present any evidence at trial from which the jury could conclude the board was the cat's paw for Poole under either of these avenues of cat's paw analysis. In fact, the testimony clearly reveals that the Board of Supervisors did not "rubber stamp" Poole's recommendation or even that the board had a record of "rubber stamping" personnel decisions by department heads. Rather, the board conducted a hearing regarding Schaeffer's alleged policy violations before making their decision. It is also noteworthy that the decision of the board to terminate Schaeffer from the county payroll was not unanimous.

Likewise, there was no evidence submitted by Schaeffer from which a jury could conclude that Poole had "influence or leverage" over the board. *Id.* *Websters* defines "influence" as "the power of persons or things to affect others, seen only in its effects" and "the ability of a person or group to produce effects indirectly by means of power based on wealth, high position, etc." Websters also defines "leverage" as the "increased means of accomplishing some purpose." It is sufficient to say that no evidence was submitted from which a jury could conclude that Poole, a subordinate employee of the board, had any particular "power" or "increased means" to control or manipulate the board's final decision regarding Schaeffer. At a minimum, some evidence of the historical working relationship or the personal dynamics between the board and Poole was required in order for any jury to conclude that the board was susceptible to Poole's influence or that Poole had leverage over the board's ultimate decision. Simply put, since Schaeffer submitted no evidence probative of, or even relating to, the elements

of a cat's paw analysis as established in the Fifth Circuit, it is clear that the jury had no basis to find that the Board of Supervisors was a cat's paw for Poole's alleged retaliatory motives.

### b. The evidence does not support an award of back pay since Schaeffer failed to mitigate his damages.

The jury was correctly instructed that "Plaintiff has a duty under the law to mitigate his damages, that is, to exercise reasonable diligence under the circumstances to minimize his damages." The jury was further instructed that, in order to establish this defense, the defendants must prove "that there was substantially equivalent employment available" and that "plaintiff failed to use reasonable diligence in seeking those positions." *West v. Nabors Drilling USA, Inc.,* 330 F. 3d 379, 393 (5th Cir. 2003).

At trial, Schaeffer admitted on cross examination that Diamond Point Land and Barge Company offered him "virtually the same job in 2014 making more money." (TR 82, Line 24 – TR 83, Line 15). In addition, Schaeffer testified that Smith Towing Company offered him a job operating their boats at a hourly rate almost twice the amount being paid to Schaeffer by the county if Schaeffer was willing to work full time. (TR 83, Line 16 – TR 84, Line 11). Schaeffer also confirmed that these two jobs were available to him "shortly after (Schaeffer's) employment ended at Warren County" (TR 84, Line 1 - 4) and admitted that he could have gone to work for Smith Towing "immediately." (TR 84, Line 5-7).

It is clear that Warren County established, through Schaeffer's own testimony, that there was substantially equivalent, if not identical, employment available to Schaeffer at all times since he left Warren County's employment. Schaeffer admitted that Smith Towing would have hired him "immediately". It is also clear that available jobs would have compensated him at an hourly rate substantially in excess of the amount that he was earning at the county.

Unquestionably, the jury failed to follow the instructions of the court on the issue of mitigation of damages. Based on the evidence and the instructions of the Court, there was no basis for the jury to award any damages, other than nominal damages, even if the jury believed that the Defendants were liable for retaliation under the FLSA. Therefore, on this record, the jury's award of back pay should be vacated and Warren County should be granted judgment as a matter of law on Schaeffer's back pay claim.

**c. Alternatively, the Court should order a remittitur or a new trial on issue of back pay.**

The jury awarded $114,847.53 in back pay and benefits.[4] This award is inconsistent with the evidence and was not calculated in accordance with the specific instructions of the Court. Schaeffer was removed from the Warren County payroll effective December 3, 2013. There was a period of 163 weeks between December 3, 2013 and the date of the jury's verdict. At the time Schaeffer's employment ended, the record reflects that he was regularly working a 42 hour week with his hourly wage was $16.55 which resulted in a weekly salary of $695.10. (TR 44, Line 15-24; TR 35, Line 22 - 25). Based on the foregoing, if Schaeffer had continued to work for the county through the date of the jury's verdict, his gross earnings would have been $113,301.30. However, the jury was required to deduct from this amount all earnings from other employment received since December 3, 2013. In addition, the jury was required to also deduct unemployment compensation and retirement benefits paid by the County. *Lubke v. City of Arlington*, 455 F. 3d 489, 499 (5th Cir. 2006); *Newcomb v. Corinth School District*, 2015 WL 1505839*13-14 (N.D. Miss 2015). The evidence showed that Schaeffer received $6,110.00 in

---

[4] Schaeffer did not introduce proper evidence of any "benefits" that he did not receive since his employment ended.

unemployment compensation.  (TR 76, Line 8-11; TR 81, Line 21 – TR 82, Line 3; Ex. D-4, Doc. 142).   The county administrator, John Smith, testified that the county is self insured for unemployment compensation.  (TR 145, Line 18 – TR 146, Line 11).  Therefore, the county is entitled to a credit against any back pay award for the entire amount of unemployment compensation received by Schaeffer.  *Newcomb*, supra.  Schaeffer also testified that he received $32,697.50 from employment at Cannon Vicksburg, LLC.  (TR 80, Line 12 – TR 81, Line 17; Ex. D-4, Doc. 177, 174, 163). The amount of these earnings should have credited against any back pay award.  Lastly, Schaeffer received $18,229.32 in retirement benefits since his employment was terminated. (TR 146, Line 12-22).  Warren County contributed $11,070.66 to those benefits and is entitled to a credit for said contribution against any back pay award.  (TR 148, Line 11 – TR 149, Line 4).  *Hardy v. City of Tupelo, Miss,* 2010 WL 730314 * 1,2.  Based on the foregoing, the jury's back pay award should be remitted to $63,423.14, or alternatively, Warren County should be awarded a new trial on the issue of back pay to which Schaeffer is entitled.

          Respectfully submitted,

          WARREN COUNTY, MISSISSIPPI and
          WARREN COUNTY BOARD OF SUPERVISORS

          BY: /s/ Kenneth B. Rector
               Bar No. 4681
               Attorney for Defendants

WHEELESS, SHAPPLEY, BAILESS
& RECTOR, LLP
POST OFFICE BOX 991
VICKSBURG, MS 39181
TELEPHONE:601-636-8451
FACSIMILE: 601-636-8481

## CERTIFICATE

I, hereby certify that on February 10, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following: Louis H. Watson and Nick Norris, 1880 Lakeland Drive, Suite G, Jackson, Mississippi 39216-4972.

This the 10th day of February, 2017.

/s/ Kenneth B. Rector